Filed 11/23/21  P. v. Gonzales CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B306537 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA082639) |
| v. | |
| BRIAN GONZALES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alan Schneider, Judge.  Affirmed in part, vacated in part and remanded.

Mark Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and

David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

In January 2016, appellant Brian Gonzales confronted his ex-girlfriend Emily Fox and her new boyfriend Jerred Scott in a hallway outside Fox's apartment and learned that Fox was dating Scott. Appellant reacted to this discovery by drawing a gun, causing Scott to flee. Appellant pursued him and forced him to return at gunpoint. After discovering that Fox had called the police while he was chasing Scott, appellant shot and killed them both. He was charged with two counts of murder. Each count was accompanied by firearm and multiple murder allegations under Penal Code sections 12022.53, subdivision (d) (section 12022.53(d)) and 190.2, subdivision (a)(3) (section 190.2(a)(3)).[1] Count two (the murder of Scott) was also accompanied by an allegation that Scott's murder was committed during a kidnapping under section 190.2, subdivision (a)(17) (section 190.2(a)(17)). Appellant pled not guilty.

At a pretrial hearing, appellant's counsel indicated he intended to present a "heat of passion" defense and wanted to call an expert to testify about which region of the brain was active when a person acted during the heat of passion.

_____

[1] Undesignated statutory references are to the Penal Code.

2

The court declined to permit such testimony, finding that a juror would know from common experience that a person could act in such a manner, and concluding it was not helpful to explain where in the brain such actions originated. After all witnesses had testified and both counsel had given their closing arguments, the jury was presented with verdict forms regarding each murder count and all charged special circumstances. The verdict form for Fox's murder additionally contained the uncharged special circumstance that her murder occurred during a kidnapping. The jury convicted appellant of all counts and found true all special circumstances, including the uncharged one. The court sentenced appellant to life without the possibility of parole for each murder count based on both the true multiple murder findings and the true kidnapping findings. The court additionally sentenced appellant to 25 years to life for each of the true firearm findings, arriving at a total sentence of life without the possibility of parole, plus 50 years to life. The court also imposed various fines and fees.

Appellant makes five arguments on appeal: (a) the court erred in excluding the expert testimony; (b) the court erred in sentencing appellant based on the true finding that Fox's murder occurred during a kidnapping; (c) the court erred in imposing fines and fees without determining appellant's ability to pay; (d) the instruction the court gave regarding reasonable doubt was inadequate to inform the jury that each element of each offense and special circumstance was required to be proven beyond a reasonable

3

doubt; and (e) the cumulative prejudicial effect of the errors in excluding the expert testimony and inadequately instructing on reasonable doubt warrants reversal.

We conclude that: (a) the court did not err in excluding the expert testimony; (b) the court erred in basing appellant's sentence in count one (Fox's murder) in part on the true finding on an uncharged special circumstance; (c) appellant forfeited any objections to the imposed fines and fees by failing to raise the issue when they were imposed; (d) our Supreme Court has already rejected appellant's argument regarding the reasonable doubt instruction, and we are bound to follow its decision; and (e) because the court did not err in excluding the expert testimony or instructing on reasonable doubt, there is no cumulative error. We therefore vacate that portion of the judgment basing appellant's sentence in count one on section 190.2(a)(17), and remand with directions to modify the abstract of judgment to remove this section as a basis for the sentence imposed on count one (and to correct the other errors discussed below). We otherwise affirm.

## STATEMENT OF RELEVANT FACTS
### A.    *Pre-Trial*

After an August 2017 preliminary hearing, the court originally held appellant to answer on two counts of murder, with additional allegations that there were multiple murders, that the murders were committed with a firearm, and that they were committed in the course of a kidnapping

4

pursuant to section 190.2(a)(17). When the prosecutor asked to clarify to which count the kidnapping allegation pertained, the court responded: "It's not specified and it occurred during the course of a crime for both, so the court will find it as to both. It is not specified in the complaint as to which count." Immediately thereafter, however, the court stated, "There is sufficient evidence as to both, but the court will hold him to answer as charged as to count two [Scott's murder] only." Two weeks later, the People filed an information charging appellant with two counts of murder, and alleging both that appellant used a firearm in each murder (§ 12022.53(d)[2]), and that each murder involved multiple murders (§ 190.2(a)(3)[3]). A kidnapping special

---

[2]   (§ 12022.53(d) ["Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life"].)

[3]   (§ 190.2(a)(3) ["The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found . . . to be true: [¶] . . . [¶] (3) The defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree"].)

5

circumstance (§ 190.2(a)(17)[4]) was alleged only as to count two, Scott's murder.  Appellant pled not guilty to all counts.

At a January 2020 pretrial hearing in which appellant's counsel explained he intended to pursue a "heat of passion" defense, the court was asked to permit appellant's expert to testify that the limbic system (the emotional part of the brain) can "'hijack'" and deactivate the prefrontal cortex of the brain (where premeditation occurs) when a person is sufficiently "'aroused'" or "'enraged.'"  The court declined, opining that "where[] within the brain these issues are formed is not as important as the fact that they were formed."  The court found the proffered testimony was unnecessary and would confuse the issues, both because the expert could not testify as to what had happened in appellant's brain, and because the jury was "eminently qualified to determine the impact on formation of premeditation and deliberation or of fear or anger or sadness . . . .  They don't need to know specifically, where, within the brain, it is formed to do that."  The court concluded it would "mislead[] the jury to worry about the complicated brain functioning" unnecessarily, and that there was "some consumption of time issue . . . ."

---

[4]     (§ 190.2(a)(17) ["The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found . . . to be true: [¶] . . . [¶] (17) The murder was committed while the defendant was engaged in . . . (B) Kidnapping in violation of Section 207, 209, or 209.5"].)

6

**B.** *Trial*

### 1. Testimony

Trial began in late January 2020. In the prosecutor's opening statement, he informed the jury that it would "hear evidence about how this defendant killed Jerred [Scott] in the commission of kidnapping" but did not similarly state that appellant had killed Fox in the commission of kidnapping. In the opening statement of appellant's counsel, he claimed appellant had shot both Fox and Scott "without premeditation and without deliberation," but rather as a reaction to discovering Fox had called the police on him, and seeing Scott step toward him.

Multiple witnesses testified at trial, including appellant and his family and friends, Fox's family and friends, and several professionals (police officers, a criminalist, a firearm examiner, and a coroner). All the witnesses agreed on the basic facts.

After Fox and appellant began dating in late 2013, appellant was verbally and physically abusive toward Fox. In one incident, Fox's best friend, Amanda Morton, was driving Fox and appellant to a restaurant. When appellant learned they were going to the Inglewood location of the restaurant instead of the Hollywood location, he began yelling and screaming at Fox, calling her a bitch, claiming she had lied, and demanding to be taken home. Fox began crying, and when Morton asked Fox if appellant always treated her in this manner, she confirmed he did. Also played at trial was a recording Fox had made of a

7

conversation between appellant and her, in which appellant apologized for choking Fox and throwing her on the couch. Morton testified that Fox had told her appellant had "[held] guns to her head," and was very controlling. From mid to late 2015, Fox began expressing a desire to break up with appellant.

By December 25, 2015, when Fox visited Morton in Dallas, Fox had broken up with appellant, had asked that his belongings be removed from her apartment, and had begun dating Scott. While Fox was visiting Morton, appellant called Fox and angrily told her that "when she got back into town . . . she had to watch her back because there was going to be bloodshed."

Though appellant moved out of Fox's apartment shortly after the new year and took most of his belongings with him, he left some personal items behind due to insufficient space in the car he was using for the move. Appellant testified that he believed he and Fox were "on a break," but had agreed not to date other people.

In January 2016, on the day of the killings, appellant was driving his 16-year-old cousin Kamal Jenkins from Santa Barbara to Inglewood, when Jenkins told him he needed to use the bathroom. Appellant suggested they stop at Fox's apartment, where Jenkins could use the bathroom, and appellant could both retrieve some of his clothes that were still there and say hello to Fox. Appellant attempted to contact Fox through various means, but received no response until he had already arrived and was pulling into the

apartment complex's subterranean garage. Fox's response was: "'Now isn't a good time because my mom is here.'"

Appellant parked in the garage and saw an unfamiliar vehicle in one of Fox's parking spaces, making him suspicious. He noticed that the driver's seat of this car was moved far back, leading appellant to suspect the car belonged to a man. Appellant told Jenkins to urinate in a corner of the parking garage; Jenkins complied, and then got back in appellant's car, joining him. Appellant tried to communicate with Fox again, but was unable to obtain a signal in the underground garage. Appellant then went to the trunk of his car and retrieved a gun. Before closing the trunk, he chambered a round, engaged the safety, and put the gun in his waistband.[5] He and Jenkins then rode the elevator to the third floor where Fox's apartment was located.

When they exited the elevator, Fox greeted them and gave Jenkins a hug. Shorty after, Scott approached, shook Jenkins's hand, and told appellant he did not know what Fox and appellant had "going on," but he had nothing to do with it, and had "no problems." Appellant asked Fox whether Scott was her new boyfriend, and after Fox stated he was,

---

[5]     Appellant testified he was armed "all the time, especially when I'm in this specific neighborhood" because it was a known Hispanic gang neighborhood, and appellant was African American; because of appellant's tattoos, other gang members often thought he was part of a gang. He claimed that arming himself in that neighborhood was simply a habit.

appellant became upset and drew his gun. Scott ran, but appellant chased him and forced him to return at gunpoint.

When appellant ran after Scott, Fox called 911 and told the operator that her ex-boyfriend had come to her property with a gun and tried to shoot her current boyfriend. After appellant returned with Scott, Scott moved next to Fox and Jenkins, and all three faced appellant. Appellant testified he saw Fox on the phone and thought, "I need to take the [gun's] safety off." He then asked Fox if she was calling the police. Appellant testified that as Fox began to answer, he saw Scott take a step toward him and he "just snapped" and "blacked out and started shooting"; Jenkins dropped to the ground and closed his eyes. A total of nine bullet casings were recovered from the scene. Appellant testified that he believed he fired from only one location, but a criminalist testified that an analysis of the bullet pathways indicated appellant was moving as he fired his gun. Fox and Scott were each shot four times; Jenkins was not shot. Appellant admitted he aimed at Scott and Fox when firing.

After he stopped shooting, appellant ran toward the stairs and Jenkins followed. The two left in appellant's car, and Jenkins called his mother. Appellant eventually dropped Jenkins off near Dodger Stadium and his mother picked him up. Several hours later, Jenkins and his mother went to the police and told them what he had seen. Two days later, appellant was apprehended without incident at a Greyhound bus station; he was sitting on a bus going to Tijuana, Mexico.

10

During closing argument, the prosecutor professed confidence that the jury would find appellant "guilty of two counts of first degree murder, that he kidnapped Jerred [Scott] in the commission of *that murder* and that he obviously killed both victims, multiple murders." (Italics added.)

## 2. The Jury Finds Appellant Guilty on All Counts

Among the jury instructions given was CALCRIM No. 220, which provided that the prosecution was required to "prove a defendant guilty beyond a reasonable doubt" and that "[w]henever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt . . . ." The jury was also instructed on what was required for a true finding on a kidnapping special circumstance, but neither that instruction nor any other specified the count to which the kidnapping instruction applied. However, the verdict form for Fox's murder contained the sentence: "We further find the special circumstance allegation that the defendant committed the offense during the crime of KIDNAPPING within the meaning of Penal Code Section 190.2(a)(17) to be: _____" with "(TRUE OR NOT TRUE)" written under the blank.[6] The record is silent as to the circumstances surrounding the approval of this verdict form.

---

[6]     Included with the verdict forms was a special verdict form, instructing the jury that if they found appellant guilty of one
*(Fn. is continued on the next page.)*

11

During deliberations, the jury asked the court, "If we find a kidnapping occurred in regards to Count 2 (Jer[r]ed Scott), and Emily [Fox] is killed in the commission of the kidnapping, does this also constitute murder 1 in regards to Emily[?]" In discussing this question, appellant's counsel indicated his belief that the answer should be "no," but the court disagreed, stating the question was what the jury found "to be in the commission of the kidnapping and 540A."[7] Appellant's counsel then asked, "wasn't the DA's theory, that limits that theory to Jerred Scott [*sic*]?" The prosecutor responded that this was "incorrect" and "ridiculous." The court's response to the jury was: "The court refers the jury to the homicide instructions already provided." The jury found appellant guilty of the first degree murders of Fox and Scott. It further found true the allegation as to each murder that it was committed during the crime of kidnapping, and that appellant intentionally

charge of first degree murder, and one additional charge of either first degree or second degree murder, they were to determine whether "the multiple murder special circumstance within the meaning of Penal Code section 190.2(a)(3)" was true.

[7] Instruction 540A provided that the defendant was charged with two counts of first degree felony murder, and that to prove defendant's guilt, the prosecution was required to prove, among other elements, that "[w]hile committing kidnapping[,] the defendant caused the death of another person."

discharged a firearm in committing the crimes.  The jury found true the multiple murder special circumstance.[8]

The court sentenced appellant to life imprisonment without the possibility of parole for each count due to both the true finding on the kidnapping special circumstance, and the true finding on the multiple murder special circumstance.  The court imposed an additional 25 years to life for each true finding that appellant discharged a firearm and caused great bodily injury, resulting in a total sentence of life without the possibility of parole, plus an additional 50 years to life.[9]  The court also ordered appellant to pay various fines and fees.  Appellant timely appealed.

---

[8]     In June 2020, appellant moved for a new trial, arguing that he had been relying on a "heat of passion defense," but was prevented from presenting expert testimony to explain that complex thought processes and impulsive decisions were governed by different regions of the brain, and that when sufficiently aroused by extreme emotion, the portion of the brain responsible for impulsive decisions could prevent premeditation.  Though appellant acknowledged "it is common knowledge that people can act without thinking while in the throes of an extreme emotional state," he argued that precluding his expert from testifying deprived him of "the opportunity to establish a very critical part of its defense: an explanation as to 'how' one part of the brain can actually prevent another part of the brain from thinking clearly and exercising judgment."  The court denied appellant's motion, and appellant does not challenge this ruling on appeal.

[9]     Both the abstract of judgment and the minute order erroneously state that appellant was sentenced to an additional 25 years under section "1202.53(d)" instead of section
*(Fn. is continued on the next page.)*

**DISCUSSION**

**A.** ***The Court Did Not Err in Excluding Expert Testimony About the Mechanics of How the Brain Functions***

At a pretrial hearing, the court refused to permit appellant's expert to testify that the limbic system can "'hijack'" and deactivate the prefrontal cortex of the brain (where premeditation occurs) when a person is sufficiently "'aroused'" or "'enraged,'" finding it was unnecessary, would confuse the issues, and would require too much time. Appellant contends the excluded testimony was relevant and would have aided the jury, the testimony was not confusing and did not require an undue consumption of time, and its exclusion was prejudicial.[10] We disagree.

We typically review a court's exclusion of evidence for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725 ["an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence"].) Citing *People v. Seijas* (2005) 36

12022.53(d). The abstract of judgment also erroneously states that appellant was sentenced under "190.2(a)(2) PC" (as opposed to section 190.2(a)(3)), and incorrectly lists his attorney as "TYREE A. ALMADA, DDA" instead of "TYREE CAMPBELL." (Manuel A. Almada was the prosecutor.)

[10] Appellant also argues that the testimony did not violate sections 28 and 29 (pertaining to expert testimony regarding a defendant's mental disease, defect, or disorder). Because the court did not exclude the testimony under those sections, we need not address this argument.

Cal.4th 291, appellant contends that because this ruling "deprived appellant of his constitutional right to present a defense, the de novo standard should apply." We find it unnecessary to decide which standard of review applies, because we would affirm under either standard.

The primary question for the jury was whether appellant's mental state precluded him from engaging in premeditation. Though appellant acknowledges "it is common knowledge that people can act without thinking while in the throes of an extreme emotional state," he fails to explain how knowing where in the brain such decisions emanate would aid the jurors in determining whether appellant acted from impulse or premeditation. Nor do we discern any other manner in which such testimony would have been helpful. Accordingly, we conclude the court acted well within its discretion in ruling that the excluded testimony had no tendency in reason to prove or disprove that appellant was in a mental state that precluded premeditation; on an independent review, we would make the same ruling ourselves.[11]

---

[11] The cases on which appellant relies are inapplicable because they deal with expert testimony on issues outside the common experience of a juror. (See *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 746 [trial court erred in precluding expert testimony regarding effect of homelessness on defendant's belief in need for self-defense]; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1076, 1087 [expert testimony regarding battered woman syndrome "'would have assisted the jury in objectively analyzing [defendant's] claim of self-defense by dispelling many of the *(Fn. is continued on the next page.)*

Moreover, the exclusion of this testimony did not prejudice appellant; thus had we found error, we would deem it harmless. The jury had already heard testimony (1) that appellant had been verbally and physically abusive toward Fox, (2) that he armed himself before going to see her, (3) that he did not draw his gun until Fox confirmed Scott was her new boyfriend, (4) that he chased Scott down after the latter ran, marching him back to Fox at gunpoint, (5) that he deliberately disengaged the safety of his gun after he saw Fox on the phone, and (6) that he aimed at both Fox and Scott (but not at Jenkins), and fired his gun while in motion, even though he claimed to have been shooting in a blind

commonly held misconceptions about battered women'"]; *In re Walker* (2007) 147 Cal.App.4th 533, 552-553 [ineffective assistance of counsel due to failure to present expert testimony on battered woman syndrome, because such testimony would have helped the jury assess "the nature and extent" of defendant's fear]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1296, 1300-1302 [expert testimony explaining why parents might not report child molestation admissible because it would aid jury in determining credibility of mother's testimony]; *People v. Coddington* (2000) 23 Cal.4th 529, 582-583 ["expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* of the mental states of premeditation and deliberation"]; *People v. Vu* (1991) 227 Cal.App.3d 810, 813 [error to exclude expert testimony that a person's actual perception of events may have differed from reality due to stress and preconceived expectations about what might happen].) By contrast, the idea that a person, when angered, could act impulsively without premeditation is within a juror's common experience.

rage.  On this record, we find beyond a reasonable doubt that hearing testimony that *if* appellant had been acting due to rage, his decisions would have emanated from his limbic system and not his prefrontal cortex, would have made no difference in the jury's verdict.[12]

---

[12]    Appellant's reliance on *People v. Cortes* (2011) 192 Cal.App.4th 873 is misplaced.  In *Cortes*, where the defendant was accused of stabbing the victim to death, an expert was prepared to testify that the defendant was acting out of fear, and that his mental function was overwhelmed and impaired during the fight.  (*Id.* at 877, 885, 894.)  However, the court precluded the expert from offering any testimony about the defendant's mental state and functioning, or his past or present psychiatric disorders or diagnoses, thus "effectively eviscerat[ing] any defense defendant had to premeditated and deliberated murder" and "prevent[ing] the jury from properly evaluating evidence that would have been relevant to its consideration of the self-defense, imperfect self-defense and heat of passion instructions given here."  (*Id.* at 912 & 899-900.)  Here, by contrast, appellant's expert would not have testified to whether appellant had entered into a state of rage, or whether he was predisposed to do so.  The exclusion of the testimony did not "eviscerate" appellant's defense, but merely prevented the jury from learning what part of the brain is responsible for the actions of a person in an emotionally charged state.  *Cortes* is thus inapposite.

**B.** ***The Court Erred in Sentencing Appellant Based on the True Finding of the Kidnapping Special Circumstance as to Fox's Murder***

The jury's finding that Fox's murder occurred "during the crime of KIDNAPPING within the meaning of Penal Code Section 190.2(a)(17)" constituted one of the bases for the court to sentence appellant on that count to life imprisonment without the possibility of parole.[13] Appellant contends the court erred in sentencing him based on this true finding because the kidnapping special circumstance was never alleged as to Fox's murder. The People counter that appellant has forfeited this argument, and that regardless, appellant was given adequate notice that the kidnapping special circumstance applied to Fox's murder as well. While we recognize that appellant makes this argument for the first time on appeal, we exercise our discretion to consider it, and find it meritorious.

### 1. We Exercise Our Discretion to Consider Appellant's Argument

Appellant admits that he "did not object to the lack of a specific kidnapping special circumstance in count 1," but argues that he did not forfeit this argument because "he put the court and prosecution on notice that he believed the

---

[13] The other basis was the jury's finding that Fox's murder was part of a multiple murder under section 190.2(a)(3).

prosecution's kidnapping theory was only as to Scott." However, the discussion appellant references related to the jury's question: "If we find a kidnapping occurred in regards to Count 2 (Jer[r]ed Scott), and Emily [Fox] is killed in the commission of the kidnapping, does this also constitute murder 1 in regards to Emily[?]"  By stating its opinion that the issue was what the jury found "to be in the commission of the kidnapping and [instruction] 540A" -- which instruction explained the elements needed to convict appellant of first degree felony murder -- the court indicated it interpreted the jury's question to be whether Scott's kidnapping could serve as the predicate felony for the felony first degree murder of Fox.  Thus, when appellant's counsel stated he believed the prosecution's kidnapping theory applied only to Scott's murder, the prosecutor replied that was both "incorrect" and "ridiculous."  The statement of appellant's counsel does not constitute an objection that the kidnapping special circumstance was improperly applied to Fox's murder.

However, while appellant failed to object adequately, we have discretion to consider his appeal on this issue.  We find instructive our Supreme Court's recent case of *People v. Anderson* (2020) 9 Cal.5th 946 (*Anderson*).  There, the defendant was charged with one count of murder and five counts of robbery.  (*Id.* at 949, 950.)  In connection with the murder count, the defendant "was subject to a 25-year-to-life enhancement based on vicarious liability for the injurious discharge of a firearm by a coparticipant in a gang-related

19

offense." (*Id.* at 951.) "By contrast, in connection with each of the robbery counts, . . . the information alleged two personal use firearm enhancements—one a 10-year enhancement . . . and the other a three-, four-, or 10-year enhancement . . . ." (*Ibid.*) But after the close of evidence, "[t]he trial court instructed the jury that it could find that the prosecution proved the elements of the 25-year-to-life vicarious firearm discharge enhancements under section 12022.53(e) as to the robbery counts—even though they were not alleged in the operative information—and approved verdict forms to the same effect. The record does not show definitively how this occurred, but it appears the prosecution requested this instruction as to the robbery counts after the close of the evidence." (*Ibid.*) The jury convicted on all counts and returned true findings on all enhancement allegations. (*Ibid.*) At sentencing, the court imposed the 25-year-to-life enhancements on each of the five robbery counts over the defendant's Eighth Amendment objection, and the defendant appealed. (*Anderson, supra,* at 952.)

On appeal, the defendant argued for the first time that the enhancements could not be imposed because they had not been adequately pled in the charging document. (*Anderson, supra,* 9 Cal.5th at 952.) Because the 25-year-to-life enhancement had been pled as to the murder count, the Court of Appeal affirmed the judgment, and the Supreme Court granted review. (*Ibid.*) On the issue of forfeiture, the Supreme Court found that although the defendant failed to object at trial that he could not be subjected to the 25-year-

20

to-life enhancements for the robbery counts because they were not pled, the court should still consider the issue because (1) the error was "clear and obvious"; (2) "the error affected substantial rights by depriving Anderson of timely notice of the potential sentence he faced"; and (3) "the error was one that goes to the overall fairness of the proceeding." (*Id.* at 963.) We address the same considerations here and exercise our discretion to consider the merits of appellant's appeal on this issue.

### 2. The Court Erred in Sentencing Appellant on the Uncharged Special Circumstance

In *Anderson*, our Supreme Court held that the defendant could not be sentenced based on true findings on unpled enhancements because the defendant "was entitled to a pleading that provided him with fair notice that he faced 25-year-to-life enhancements under section 12022.53(e) as to each charged robbery offense if this was the prosecution's intent." (*Anderson*, *supra*, 9 Cal.5th at 955.) The court elaborated that "[a] pleading that alleges an enhancement as to one count does not provide fair notice that the same enhancement might be imposed as to a different count. When a pleading alleges an enhancement in connection with one count but not another, the defendant is ordinarily entitled to assume the prosecution made a discretionary choice not to pursue the enhancement on the second count, and to rely on that choice in making decisions such as

whether to plead guilty or proceed to trial."  (*Id.* at 956.)
"Fair notice requires that every sentence enhancement be
pleaded in connection with every count as to which it is
imposed."  (*Id.* at 956-957.)  The court also rejected the
Attorney General's argument that defense counsel's
agreement to the verdict forms containing the 25-year-to-life
enhancements for the robbery counts constituted an informal
agreement to amend the information, finding that "to treat
defense counsel's lack of objection as acquiescence or consent
would go a long way toward eroding Anderson's right to
notice of the potential penalties he faced."  (*Id.* at 960.)

The facts in the instant appeal are strikingly similar:
just as the more severe firearm enhancements in *Anderson*
were pled only as to some of the counts, so too was the
kidnapping special circumstance in the instant case pled
only as to count two, Scott's murder.  In both cases, while the
information was never amended to add the unpled
enhancements to other counts, the verdict forms for those
other counts contained a space for the jury to make a true
finding as to the unpled enhancements, and the jury did so.
The court in both cases then imposed sentences based on
those true findings.

The People attempt to distinguish *Anderson*, arguing
that unlike the defendant there, "appellant had notice that
the kidnapping special circumstance pertaining to the
kidnapping of Scott was at issue" because "it was alleged in
the information as to count 2 and the jury verdict forms
contained the kidnapping special circumstance as to both

22

counts." But in *Anderson*, the defendant also had notice that the more severe firearm enhancements were at issue because they were alleged in connection with the murder count, and also were contained in the jury verdict forms. (*Anderson, supra*, 9 Cal.5th at 951.) Here, the kidnapping special circumstance was neither alleged in connection with the murder of Fox (count one) nor alluded to by the prosecutor.

In support of their argument that we should find forfeiture or that appellant impliedly consented to the application of the kidnapping special circumstance to Fox's murder, the People cite *People v. Houston* (2012) 54 Cal.4th 1186 (*Houston*); *People v. Ward* (2005) 36 Cal.4th 186 (*Ward*), *People v. Toro* (1989) 47 Cal.3d 966 (*Toro*), and *People v. Valenzuela* (2011) 199 Cal.App.4th 1214 (*Valenzuela*). We find these cases inapposite.

In *Houston*, while the indictment "did not allege that the attempted murders were deliberate and premeditated," the court undertook several actions that made clear the jury would be asked to determine deliberation and premeditation. (*Houston, supra*, 54 Cal.4th at 1226.) These included presenting the parties with a "preliminary draft of the verdict forms, which indicated that the court would ask the jury to determine whether the attempted murders were willful, deliberate, and premeditated"; specifically stating its belief that the prosecution was "intending to charge premeditated attempted murder" with a penalty of life imprisonment and instructing counsel to correct the court if

23

they disagreed; and announcing "its intent to have the attempted murder verdict form list deliberate and premeditated attempted murder as 'a special finding'" and "instruct[ing] the jurors . . . to determine whether the attempted murders were willful, deliberate, and premeditated." (*Ibid.*) Because the defendant did not object at any of these points, or at sentencing, the Supreme Court found the defendant had forfeited any argument concerning a defective indictment. Here, unlike *Houston*, there was no midtrial discussion highlighting the prosecution's intent to apply the kidnapping special circumstance to Fox's murder. (See *Anderson, supra,* 9 Cal.5th at 963 ["unlike *Houston* . . . there was no midtrial discussion highlighting the prosecution's intent to seek the more serious vicarious firearm enhancements instead of the less serious personal use enhancements charged in the information"].)

In *Ward*, the defendant was charged initially with multiple murders and a "multiple-murder special circumstance" under section 190.2(a)(3). (*Ward, supra,* 36 Cal.4th at 193.) The defendant then successfully moved to sever the murder charges such that he was tried in one trial for one murder, and a subsequent trial for the second murder. (*Ibid.*) After he was convicted of murder by the first jury, the second jury also found true an allegation that "[t]he defendant was convicted previously of murder in the first or second degree" pursuant to section 190.2, subdivision (a)(2). (*Ward, supra,* at 219.) On appeal, the defendant argued he could not be punished under subdivision (a)(2),

because he was charged under subdivision (a)(3). (*Ward,* at 218-219.) Our Supreme Court rejected this argument, first noting that both subdivisions "'are plainly complementary, and were evidently intended to define a single basic special circumstance—multiple murder—which can be satisfied by convictions in a single proceeding or in more than one proceeding'" and then finding that "defendant, by accepting the jury instruction and the jury's finding on the allegedly uncharged special circumstance, acquiesced in the special circumstance finding. Indeed, defendant expressly acknowledged that severance of his murder charges would result in the application of section 190.2, subdivision (a)(2). As such, no amendment of the information was necessary . . . ." (*Id.* at 219, italics omitted.) Here, by contrast, there was no complementary kidnapping special circumstance alleged as to Fox's murder, there was no acknowledgment that this special circumstance applied to Fox's murder, and although appellant agreed to a kidnapping special circumstance jury instruction, there was no indication that this kidnapping special circumstance instruction applied to Fox's murder, as opposed to only Scott's murder.

In *Toro*, our Supreme Court considered whether a jury could convict on an uncharged lesser related offense (battery with serious bodily injury when the defendant was charged with attempted murder). (*Toro*, *supra*, 47 Cal.3d at 969.) The court concluded that "when a lesser related offense is submitted to the jury without objection, the defendant must be regarded as having impliedly consented to the jury's

25

consideration of the offense . . . ." (*Id.* at 970.)  But as our Supreme Court clarified in *Anderson*, *Toro* "was quite different from the situation we confront in this case" because "[u]nlike the defendant in *Toro*, Anderson derived no possible benefit from submitting the unpleaded 25-year-to-life enhancements to the jury.  There is therefore no reason to presume from defense counsel's silence that Anderson consented to this procedure." (*Anderson*, *supra*, 9 Cal.5th at 959.)  Similar to *Anderson*, and unlike *Toro*, appellant derived no possible benefit from submitting to the jury the unpled kidnapping special circumstance as applied to Fox's murder.

Finally, in *Valenzuela*, the defendant was charged with murder.  (*Valenzuela*, *supra*, 199 Cal.App.4th at 1217.)  The jury found true a special circumstance of shooting from a motor vehicle, even though this circumstance was not charged in the information.  (*Id.* at 1236.)  On appeal, the defendant argued this was improper, but the Court of Appeal disagreed because the trial court had specifically informed counsel it intended to instruct on this special circumstance, and defense counsel had stated she had no objection.  (*Id.* at 1236-1237.)  Here, nothing in the record suggests anyone asked appellant's counsel whether he objected to applying the kidnapping special circumstance allegation to Fox's murder.

### 3. Resentencing Is Unnecessary

Following *Anderson*, we conclude the court erred in sentencing appellant based on the true finding of an uncharged special circumstance. We need not remand for resentencing, however, as the mandatory life sentence imposed on count one (Fox's murder) was also based on the jury's true finding under section 190.2(a)(3) (multiple murder). This finding is unchallenged. Because correcting the court's error will not alter appellant's sentence in any way, we vacate section 190.2(a)(17) as a basis for appellant's sentence on count one, and remand with directions that the court modify the abstract of judgment accordingly. Specifically, any reference to section 190.2(a)(17) should state it is a basis for the sentence only on count two (Scott's murder). Based on the jury's true finding of the multiple murder special circumstance on count one, appellant remains subject to the same life-without-parole sentence on that count.

### C. *The Court Did Not Err in Imposing Fines and Fees*

Though appellant now argues the court erred in imposing various fines and fees at sentencing without determining his ability to pay, he admits he failed to object to these fines and fees in the trial court. We agree with our colleagues in Division Eight that a failure to object in the trial court forfeits this issue on appeal. (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1155; accord,

27

*People v. Keene* (2019) 43 Cal.App.5th 861.) Accordingly, we do not consider appellant's contentions.

### D.   *The Court Did Not Err in Instructing the Jury*

Appellant contends the court erred by failing to instruct the jury that every element of every offense was required to be proven beyond a reasonable doubt, and argues that the issue is preserved on appeal despite his failure to object. Appellant acknowledges that our Supreme Court has rejected this argument and that we are obligated to follow its decisions. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 910-911 [appellant's failure to object forfeited claim that court erred by failing to instruct every element must be proved beyond reasonable doubt; in any case, this claim is rejected]; *People v. Mackey* (2015) 233 Cal.App.4th 32, 87 ["we are bound to follow our state Supreme Court's decisions"].)

### E.   *There Was No Cumulative Error*

Appellant argues that "the court's exclusion of expert testimony, combined with its failure to explicitly instruct the jury that it must find each element of all crimes and allegations proved beyond a reasonable doubt" constituted cumulative error that warrants reversal. Because we conclude the court did not err in these instances, we find no cumulative error.

28

## DISPOSITION

We vacate the judgment to the extent the true finding under section 190.2(a)(17) on count one (Fox's murder) was a basis for appellant's sentence on that count. On remand, we direct the court to modify the abstract of judgment to reflect that: (1) section 190.2(a)(17) is the basis for appellant's sentence only as to count two (Scott's murder); (2) other bases for appellant's sentence on both counts are section 190.2(a)(3) (not section 190.2(a)(2)) and section 12022.53(d) (not section 1202.53(d)); and (3) appellant's counsel was Tyree Campbell (not Tyree A. Almada, DDA). The court shall forward this modified abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                                  MANELLA, P. J.

We concur:

WILLHITE, J.                                    CURREY, J.